J-S82045-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN RE: ADOPTION OF: N.K.M. : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| APPEAL OF: M.J.M., NATURAL : | |
| FATHER : | No. 1410 WDA 2017 |

Appeal from the Order Entered August 3, 2017
in the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): No. 38 of 2017

BEFORE:   BENDER, P.J.E., STEVENS, P.J.E.*, and STRASSBURGER, J.**

MEMORANDUM BY STRASSBURGER, J.:            FILED JANUARY 29, 2018

M.J.M. (Father) appeals from the order entered August 3, 2017, in the Court of Common Pleas of Westmoreland County, which terminated involuntarily his parental rights to his minor son, N.K.M. (Child), born in July 2007.[1, 2]  We affirm.

_____

* Former Justice specially assigned to the Superior Court.

** Retired Senior Judge assigned to the Superior Court.

[1] C.B. (Mother) relinquished her parental rights voluntarily.  Mother did not file a brief in connection with this appeal, nor did she file a separate appeal.

[2] Child was represented by two attorneys, one serving as guardian ad litem and one serving as legal counsel.  Child's guardian ad litem submitted a letter to this Court indicating that he was unable to file a brief due to a recent surgery and expressing his position that the orphans' court acted properly in terminating parental rights.  We note with extreme displeasure that Child's legal counsel failed to file a brief or otherwise advocate for and
(Footnote Continued Next Page)

The orphans' court summarized the factual and procedural history of this matter as follows.

> ... A Petition for Emergency Protective Custody was filed by the Westmoreland County Children's Bureau [(WCCB)], and [C]hild was placed into [WCCB] custody on September 11, 2015[,] due to [Child's] witnessing domestic violence between his parents, as well as Father's abuse of alcohol. The domestic violence witnessed by [C]hild led to a Protection from Abuse Order ("PFA") filed by Mother against Father, [which] Father subsequently violated. Additionally, both [p]arents had significant criminal histories, with Mother experiencing periods of incarceration which left Father as the primary caretaker. [C]hild, approximately seven [] years old at the time, expressed being fearful of Father due to Father's alcohol usage.
>
> [Child] was adjudicated dependent on September 25, 2015. [WCCB] ordered services for both parents in this case, in order to further their goal of reunification with [C]hild. Father was specifically ordered to undergo a parenting program, outpatient drug and alcohol treatment, random drug screenings, domestic violence offenders treatment, and to obtain suitable housing and employment. He was eventually also ordered to complete a mental health evaluation. Father successfully completed the parenting program, mental health evaluation, and

(Footnote Continued) ————————————————

set forth Child's position to this Court. Counsel's responsibility to Child did not end at the conclusion of the termination of parental rights hearing. See In re Adoption of J.L., 769 A.2d 1182, 1185 (Pa. Super. 2001); see also In re M.T., 607 A.2d 271, 276 (Pa. Super. 1992) (observing that child's counsel abdicated his legal responsibilities to his client because counsel, inter alia, failed to file a brief, indicate that he joined another party's brief, or otherwise notify this Court of his client's position). While in this case our appellate review was not impeded by counsel's failure, and we were able to surmise Child's position from the record (discussed more specifically infra), we caution counsel that it is his job "to represent [his client] with zeal and professionalism. [Child has] no say in [appointment of counsel] and deserve[s] to have the benefit of effective representation, particularly when a matter as important as [his] future relationship with a biological parent is at stake." In re J.J.F., 729 A.2d 79, 83 (Pa. Super. 1999) (Schiller, J., concurring).

recommendation to complete a second round of drug and alcohol treatment in 2017. He did enroll in treatment; however, he was unsuccessfully discharged from Gateway drug and alcohol treatment center on June 26, 2017.

The most recent problematic incident involving Father was another instance of domestic violence between Father and Mother. Allegedly, Mother was asleep in Father's apartment, when Father came in and violently attacked her. It was reported that [F]ather hit her, kicked her, threw her against a wall, and held an electric drill to her head and threatened to kill her. The caseworker stated that she believed Father and Mother had been under the influence at the time of the event. Father is currently incarcerated for this reason, and the case is currently pending … in Westmoreland County.[3] He has been charged with terroristic threats, disorderly conduct, harassment, simple assault and two felony counts of aggravated assault. Upon learning of this incident, [C]hild expressed serious anger towards Father, stating that he would only go to visit [F]ather in jail to "beat him up." Visitation with Father has been suspended since this time. …

Orphans' Court Opinion, 9/22/2017, at 2-4.

On March 28, 2017, WCCB filed a petition to terminate Father's parental rights involuntarily. The orphans' court conducted a termination hearing on August 3, 2017. Following the hearing, the court entered an order terminating Father's parental rights. Father timely filed a notice of appeal on August 25, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

_____

[3] Father was incarcerated in June 2017, the same month that Gateway discharged him from drug and alcohol treatment. It is not clear from the record whether Gateway discharged Father because of his incarceration.

1. Was clear and convincing evidence presented to show that termination was warranted pursuant to 23 Pa. C.S.[ subs]ections 2511(a)(2), 2511(a)(5), 2511(a)(8), and 2511(b)?

2. Did the [orphans'] court err in terminating Father's parental rights despite evidence that Father had participated and made significant progress in services provided?

3. Did the [orphans'] court err in terminating Father's parental rights despite evidence that [C]hild [] dictated the extent of services provided to Father and frequency of visits?

4. Did the [orphans'] court err in terminating Father's parental rights despite evidence that [C]hild's alleged wishes in regard to Father were influenced by [] Mother and foster parents?

5. Did the [orphans'] court err in terminating Father's parental rights due to the weight placed on Father's pending criminal charges that were not disposed [of] and Father was not convicted of and said charges were filed after [WCCB's] filing of the underlying termination petition?

6. Did the [orphans'] court err in relying on environmental factors beyond Father's control in terminating Father's parental rights?

7. Did the [orphans'] court err in terminating Father's parental rights despite evidence that Mother had unlimited access to [C]hild despite not participating in any court-ordered services and evidence that Mother heavily influenced [C]hild in regard to Father?

8. Did the [orphans'] court err in terminating Father's parental rights based upon evidence received from Mother and foster parents, despite concerns from both [WCCB], Father and the [orphans' c]ourt about Mother and foster parents?

Father's Brief at 4-5 (suggested answers omitted) (emphasis in original).

We review Father's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [sub]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [sub]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to subsections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super.

2004) (en banc). Here, we analyze the court's decision to terminate under subsections 2511(a)(2) and (b), which provide as follows.

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

> causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Importantly, "a parent's incarceration is relevant to the [sub]section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." In re A.D., 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

While Father lists eight issues in his statement of questions involved, he includes only four issues in the argument section of his brief. Father's issues are interrelated; so we will address them together. With respect to subsection 2511(a)(2), Father argues that he complied with services, and disputes the finding of the orphans' court that he continues to engage in domestic violence and alcohol abuse. Father's Brief at 13-15, 25. Father further argues that he has not pled guilty to, or been convicted of, his current criminal charges, and that he was charged after WCCB filed its termination petition. Id. at 16-17, 24-26. Because of this, Father contends that the charges "should not be relied upon as the sole basis" to terminate his parental rights. Id.

Instantly, the orphans' court found that Father is incapable of parenting Child, and that Father cannot, or will not, remedy his parental incapacity. Orphans' Court Opinion, 9/22/2017, at 8. The court reasoned that Father failed to remedy his domestic violence and alcohol abuse issues. Id. at 8-9. The court emphasized that Father was discharged unsuccessfully from domestic violence counseling and offenders treatment, that Father received criminal charges stemming from a recent incident of alleged domestic violence, that the WCCB caseworker and Child's visitation supervisor discovered alcohol in Father's apartment consistently, and that Child reported smelling alcohol on Father's breath. Id.

Our review of the record supports the findings of the orphans' court. During the termination hearing, WCCB presented the testimony of Father's domestic violence counselor, Cynthia King, MSSA, LCSW. Ms. King testified that she began providing counseling to Father in March 2015, and that her treatment goals were to reduce the intensity and frequency of Father's impulsive behaviors, to assist Father in forming healthy adult relationships that did not include violence, and to help Father learn how to parent Child in a healthy way that involves consistency, structure, and making good decisions for Child. N.T., 8/3/2017, at 8, 21.

Ms. King conducted a mental health examination of Father, which revealed that Father displays narcissistic personality traits. Id. at 7-8, 14. Furthermore, Father's score on the Hare Psychopathy Checklist was highly

concerning, particularly relative to Father's "interpersonal and affective facets." Exhibit WCCB 1 (Termination of Parental Rights Court Summary Report), at 5-6. Ms. King testified that individuals with these characteristics "are individuals who are typically focused on their own needs and wants. They have a difficult time placing their needs and desires behind someone else. And parenting is primarily about someone else." Id. at 7-8.

With respect to Father's success in treatment, Ms. King testified that he began exhibiting progress in "April to early to mid-June" 2015. Id. at 21. However, Father's progress soon deteriorated, and substance abuse became a major concern.[4] Id. at 11. Ms. King described the impact of Father's substance abuse as follows.

> He was getting very angry and made a lot of threatening statements around the individuals around him at the time. He was coming into session and talking about getting even with [Mother]. He had sent an inappropriate text to the foster parents of [Child]. He took no responsibility at all for his positive drug tests that were coming up.

Id. at 13.

_____

[4] Ms. King explained that Father admitted to alcohol use "pretty regularly" during their counseling sessions, but that he minimized his drinking and denied that it interfered with his life. N.T., 8/3/2017, at 12. Additionally, the record reflects that Father tested positive for controlled substances on three occasions during Child's dependency. Id. at 62. In November 2015, Father tested positive for cocaine. Exhibit WCCB 3 (dependency orders). In October 2016, Father tested positive for morphine and opiates. Id. In December 2016, Father once again tested positive for cocaine. Id.

As a result of Father's substance abuse, Ms. King discharged Father from domestic violence counseling unsuccessfully in January 2017. Id. at 11. She discharged Father with a strong recommendation that he seek additional drug and alcohol counseling. Id. Ms. King instructed Father that he could return for additional domestic violence counseling once he was able to manage his substance abuse. Id. at 11-12. Father did not return. Id. at 12.

Ultimately, Ms. King opined that Father is not ready or able to parent Child. Id. at 16. She explained,

> [Father] was in a very bad place when I last saw him. In the last several sessions, he had turned to blaming everyone else for his behavior. He was unable to focus on [Child] at all. Most of our sessions were him being very angry with everyone, work, [Mother], the foster parents. He was out of control basically. I think that his substance usage was a significant part [of] that. So, he would need to be clean and sober and demonstrate that, and be able to step away from what is in his best interest and to what is in [Child's] best interest.

Id. at 16-17. Ms. King added that it would be "very difficult for [Father] to ever be in a situation where he could be a single father." Id. at 17-18. She believed that additional therapy would be helpful for Father, but that "I don't know if that would eliminate all of the barriers." Id. at 18.

Thus, the record confirms that Father is incapable of parenting Child, and that he cannot, or will not, remedy his parental incapacity. While Father made some efforts to comply with services during Child's dependency, his unresolved substance abuse issues and failure to complete domestic violence

counseling remain significant concerns. Moreover, while it is true that Father has not been convicted of his current criminal charges, his incarceration poses a significant impediment to his ability to parent Child. As Father admitted during the hearing, he will remain incarcerated "into the foreseeable future[.]" N.T., 8/3/2017, at 121. Even when Father is released from incarceration, he will be in no position to provide parental care. Child cannot wait for permanency and stability any longer. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b).

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might

> have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court found that terminating Father's parental rights would best serve Child's needs and welfare. Orphans' Court Opinion, 9/22/2017, at 10. The court reasoned that Child is thriving in his foster home, and that Child has stated that he wants to remain with his foster family. Id. The court reasoned that Child is fearful of Father, and that Child does not feel comfortable having unsupervised visits with Father. Id. at 10-11. While the court acknowledged that Child and Father share a bond, it concluded that this bond is not "a consistently positive influence" for Child, and that terminating Father's parental rights would not negatively impact Child. Id. at 11.

Father argues that WCCB failed to present sufficient evidence with respect to subsection 2511(b).[5] Father's Brief at 17, 19. Father argues that

_____

[5] As part of his argument with respect to subsection 2511(b), Father contends that the orphans' court terminated his parental rights based on environmental factors, including his lack of housing and employment, which were beyond his control due to his incarceration. Father's Brief at 24. Subsection 2511(b) provides, in relevant part, that "[t]he rights of a parent
(Footnote Continued Next Page)

he maintained contact with Child, that he performed well during his visits with Child, and that he and Child share a bond. Id. at 18, 21. Father further argues that Child's foster parents granted Mother "unfettered access" to Child, and that the foster parents and Mother manipulated Child in order to weaken his relationship with Father. Id. at 20-23.

Our review of the record again supports the findings of the orphans' court. During the termination hearing, WCCB presented the testimony of caseworker, Dawn Trail. Ms. Trail testified that Child showed little enthusiasm for Father during their visits. N.T., 8/3/2017, at 67-68. She explained, "[Child] doesn't get excited or light up when he sees his dad. He doesn't run to him. He acknowledges him and has more of just a conversation." Id. at 68. WCCB provided Father with opportunities to increase his visits with Child, but Father did not avail himself of those opportunities. Id. at 66-67, 78. Ms. Trail testified that Child has been very upset with Father recently, due to his alleged domestic violence against Mother and resulting incarceration in June 2017. Id. at 67. As the orphans' court indicated in its opinion, the court suspended Child's visits with Father

(Footnote Continued) ———————————————

shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b)) (emphasis added). This claim fails immediately, as it is clear that the court did not terminate Father's parental rights based solely on those factors. The court specifically rejected this claim in its opinion, stating, "[t]his [c]ourt is convinced that termination in this case is not based only on environmental factors beyond Father's control." Orphans' Court Opinion, 9/22/2017, at 11.

after Child made comments that "he would only go to the jail to see [Father] so he can beat him up." Id.

In contrast, Ms. Trail testified that Child is doing well in his pre-adoptive foster home. Id. at 73. Ms. Trail recalled a recent conversation that she had with Child about the possibility that his foster parents would adopt him. Id. at 72. Child stated "that where he is now is his home, it has been his home and that's where he wishes to stay."[6] Id.

Ms. Trail acknowledged that Child's foster parents allow Mother to have "unlimited access" to Child. Id. at 77. She also acknowledged that there has been at least one occasion during which Mother spent time with Child, and Child became less "enthusiastic" about seeing Father. Id. 79. Ms. Trail agreed that she has concerns "as far as all adults having discussions in front of [C]hild about each other[.]" Id. at 78. However, she testified that Child suffers from post-traumatic stress disorder, and opined that Child's reluctance to visit with Father results from his past trauma rather than "the current conversations." Id. at 80.

Thus, the record confirms that terminating Father's parental rights will best serve Child's needs and welfare. As discussed above, Father is

_____

[6] Similarly, Child's visitation supervisor, Olivia Halula, testified that Child "has told me before that he wants to stay with the foster parents. He does not want to go back with [Father]." N.T., 8/3/2017, at 48. Child reported to Ms. Halula that he is afraid of Father, that he has been hoping that Father would go to jail, and that he never wants to be alone with Father. Id. at 42-43, 56.

incapable of parenting Child, and he will not be capable of parenting Child at any point in the foreseeable future. While Father has been incapable of parenting Child, Child has been experiencing love, safety, stability, and security with his foster family. Child is doing well with his foster family and views the foster home as his home. Although Child has a relationship with Father, the record indicates that the relationship is not "necessary and beneficial" to Child, and that severing the relationship will not cause Child to suffer emotional harm. In re Adoption of G.L.L., 124 A.3d 344, 347 (Pa. Super. 2015) (instructing courts to discern effect on child if parental rights were to be terminated, and to consider whether terminating parental rights would destroy an existing bond that is "necessary and beneficial" to the child). Contrary to Father's argument on appeal, the record indicates that Child's negative feelings towards Father stem from fear and past trauma, rather than manipulation by Mother and Child's foster parents.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights involuntarily. Therefore, we affirm the court's August 3, 2017 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/29/17